BRODSKY & SMITH, LLC
Evan J. Smith
Marc L. Ackerman
1040 Kings Highway N., Suite 601
Cherry Hill, NJ 08034
Tel. (856) 795-7250

*Attorneys for Plaintiff*

| | |
|---|---|
| WES ZALEWSKI, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> ANADIGICS, INC., RON MICHELS, DENNIS STRIGL, RICHARD KELSON, DAVID FELLOWS, HARRY REIN, RONALD ROSENZWEIG, II-VI INCORPORATED, and REGULUS ACQUISITION SUB, INC., <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION: SOMERSET COUNTY <br> DOCKET NO. C-12005-15 <br><br><br> Civil Action |

## CLASS ACTION COMPLAINT

Plaintiff Wes Zalewski ("Zalewski" or the "Plaintiff") on behalf of himself and all other

similarly situated public shareholders of Anadigics, Inc. ("Anadigics" or "Company"), bring the

following Class Action Complaint against the members of the board of directors of Anadigics (the

"Board" or the "Individual Defendants") for breaching their fiduciary duties, and against

Anadigics, II-VI Incorporated ("II-VI" or the "Parent") and Regulus Acquisition Sub, Inc.

("Merger Sub") for aiding and abetting these breaches. This shareholder class action seeks to

enjoin the acquisition of the publicly owned shares of Anadigics common stock by II-VI and

Merger Sub as detailed herein (the "Proposed Transaction").

The allegations of this Complaint are based on the knowledge of the Plaintiff as to themselves, and on information and belief, including the investigation of counsel and publicly available information, as to all other matters.

## INTRODUCTION

1.      On January 15, 2016, Anadigics announced that it had entered into a definitive agreement under which II-VI will acquire all outstanding shares of Anadigics for approximately $0.66 per share in cash ("Merger Agreement"). Under the terms of the Proposed Transaction, the deal will be structured as a tender offer, which will commence no later than ten days from the date of the Merger Agreement, and ending twenty days thereafter.

2.      This deal comes as the result of an unsolicited "superior offer" being presented to the Company during the Tender Offer go-shop period of a previous merger agreement (the "Previous Transaction"), which was entered into by the Company and GaAs Labs, LLC ("GaAs Labs") on November 11, 2015 and which was terminated on January 19, 2016.

3.      The Anadigics Board of Directors has breached its fiduciary duties by failing to maximize the consideration available to Anadigics shareholders. The Proposed Transaction offers Anadigics shareholders inadequate consideration for their shares, particularly in light of the Company's strong growth potential and a higher bid that was turned down by the Company.

4.      Notably the Company has a traded as high as $1.55 per share within the past two years. Furthermore, a group of four *Yahoo! Finance* analysts have pegged the Company's value as high as $1.25 per share, with a mean valuation of $0.74 per share.

5.      The Anadigics Board of Directors further breached its fiduciary duties by agreeing to a number of deal protection provisions that dissuade competing bidders who, but for those

provisions designed to chill their interest, could offer more value to the Company's shareholders. Specifically, the Merger Agreement includes:

      a.    a *"no solicitation"* provision that precludes the Board from attempting to maximize shareholder value by soliciting or negotiating with any other potential acquirer and requires that the Board cease all such existing communications and negotiations;

      b.    an *"information rights"* provision that requires the Board to give full information about competing acquisition proposals to II-VI (including the identity of the suitor and the terms and conditions of any competing offer) within 24 hours of their receipt;

      c.    a *"matching rights"* provision that allows II-VI the right to match any competing proposal once they receive the relevant information; and

      d.    a *"termination fee"* provision whereby the Board agreed that Anadigics would pay II-VI a termination fee of $1.2 million if Anadigics terminates the Proposed Transaction because of a superior or alternative proposal in the event the Company receives a higher offer for the Company and its shareholders, despite the no solicitation provision.

      6.    Also, on November 12, 2015, Defendants filed a Recommendation Statement on Schedule 14D-9 with the U.S. Securities and Exchange Commission ("SEC") in connection with the Previous Transaction (the "Previous Recommendation Statement").

      7.    Notably, on January 25, 2016, Anadigics filed an 8-K announcing that the Company had received an unsolicited offer from a third party to purchase the company at $0.76 per share. This third-party has been involved in negotiations with the Company throughout the period. Should this be deemed to be a "superior offer" and the current merger agreement terminated, the Board will have caused Anadigics to expend another $1.2 million in termination fees (totalling

$2.4 million) as a result of its failure to implement a proper process to sell the Company from the outset.

8.       In sum, Defendants utilized a defective sales process that was not designed to maximize shareholder value or to protect the interests of Anadigics shareholders, but rather was designed to create material personal benefits and divert the Company's valuable assets to II-VI.

9.       Each of the Defendants has breached his fiduciary duties, and/or has aided and abetted such breaches by favoring his own financial interests over those of Anadigics and the public shareholders, and by disseminating false and misleading information in connection with the shareholder vote. As a result, Plaintiff and the other Anadigics public shareholders are receiving an unfair price in the Proposed Transaction and are being asked to vote on the Proposed Transaction without all of the necessary and material information needed to cast a fully informed vote.

10.      For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' (as defined herein) violations of their fiduciary duties and from II-VI.

## PARTIES

11.      Plaintiff is, and at all relevant times was, a continuous stockholder of Defendant Anadigics.

12.      Defendant Anadigics is a corporation organized and existing under the laws of Delaware with its corporate headquarters located at 141 Mt. Bethel Road, Warren, New Jersey. Anadigics is a global leader in technology, design, and manufacturing of radio frequency ("RF")

semiconductor solutions for infrastructure and mobile communications and data transmission markets. Anadigics common stock trades on the NasdaqCM under the ticker symbol "ANAD."

13.     Defendant Ron Michels ("Michels") has served on the Company Board of Directors at all relevant times. Michaels also serves as the Chairman of the Board and the Chief Executive Officer ("CEO") of Anadigics.

14.     Defendant Dennis Strigl ("Strigl") has served on the Company Board of Directors at all relevant times. Strigl also serves as the Chair of the Governance and Nominating Committee and as a member on the Compensation and HR Committee.

15.     Defendant Richard Kelson ("Kelson") has served on the Company Board of Directors at all relevant times. Kelson also serves as a member on the Governance and Nominating Committee and on the Compensation and HR Committee.

16.     Defendant David Fellows ("Fellows") has served on the Company Board of Directors at all relevant times. Fellows also serves as a member on the Governance and Nominating Committee and on the Audit Committee.

17.     Defendant Harry Rein ("Rein") has served on the Company Board of Directors at all relevant times. Rein also serves as the Chair of the Audit Committee and the Compensation and HR Committee and as a member of the Governance and Nominating Committee.

18.     Defendant Ronald Rosenzweig ("Rosenzweig") has served on the Company Board of Directors at all relevant times.

19.     Defendants Michaels, Strigl, Kelson, Fellows, Rein, and Rosenzweig are collectively referred to herein as the "Board" or the "Individual Defendants."

20.     Defendant II-VI is a corporation organized and existing under the laws of Pennsylvania with a principal place of business at 375 Saxonburg Boulevard, Saxonburg,

Pennsylvania. II-VI is a global leader in engineered materials and opto-electronic components and is a vertically integrated manufacturing company that develops innovative products for diversified applications in the industrial, optical communications, military, life sciences, semiconductor equipment, and consumer markets. II-VI is traded on the NasdaqGS under the ticker symbol "IIVI".

21. Defendant Merger Sub, is a corporation organized and existing under the laws of Delaware, and a wholly-owned subsidiary of II-VI formed solely for the purpose of consummating the Proposed Transaction. Merger Sub can be served c/o The Corporation Trust Company at Corporation Trust Center, 1209 Orange St., Wilmington, DE.

22. Collectively, Anadigics, the Individual Defendants, II-VI, and Merger Sub are referred to herein as the "Defendants."

## JURISDICTION AND VENUE

23. This Court has jurisdiction over this action because Anadigics' principal place of business is in New Jersey, and the wrongful conduct challenged herein relates to the Individual Defendants' actions as directors and/or officers of Anadigics.

24. This Court has personal jurisdiction over each defendant in that each defendant is alleged herein to have engaged in the wrongful conduct alleged herein, each of the Individual Defendants is a director and/or officer of the Company, and/or each defendant has sufficient minimum contacts with New Jersey as to render the exercise of jurisdiction by the New Jersey courts permissible under traditional notions of fair play and substantial justice.

25. Venue is proper in this Court because Anadigics is headquartered in Warren, New Jersey.

6

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 4.32 on behalf of all holders of Anadigics common stock who are being and will be harmed by Defendants' actions described below ("Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants.

27.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable. As of October 3, 2015, there were 88.83 million shares of Anadigics common stock issued and outstanding. The actual number of public shareholders of Anadigics will be ascertained through discovery.

b.     There are questions of law and fact that are common to the Class, including:

i)     whether the Individual Defendants have breached their fiduciary duties with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

ii)    whether the Individual Defendants have breached their fiduciary duty to obtain the best price available for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

iii)   whether the Individual Defendants have breached their fiduciary duty to disclose all material facts to Plaintiff and the other members of the Class in connection with the Proposed Transaction; and

iv)    whether Plaintiff and the other members of the Class would suffer

7

irreparable injury were the Proposed Transaction complained of herein consummated.

c.     Plaintiff is an adequate representatives of the Class, and has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

d.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## FURTHER SUBSTANTIVE ALLEGATIONS

A.    **Background**

28.    Anadigics is a global leader in the technology, design, and manufacturing of RF semiconductor solutions for infrastructure and mobile communications and data transmission markets. Through advanced RF solutions, the Company solves complex dataflow challenges that exist today and are expected to arise in the future. Anadigics strategy revolves around manufacturing and delivering RF products that offer greater performance, reliability, and integration to enable high-speed data communications and transmissions.

29.     The Company offers a variety of infrastructure applications, including CATV, WiFi, Wireless, and IoT applications.  Furthermore Anadigics is present in the mobile market as well, offering such mobile applications related to WiFi and Cellular.  Finally Anadigics offers, through their manufacturing services, offers the industry's first 6-inch fabrication process for vertical-cavity surface-emitting lasers ("VCSELs").

30.     Anadigics has displayed strong performance recently.  On March 6, 2015, the Company filed their financial results for the 2014 year on form 10-K, which showcased a dramatic improvement over the previous year following a restructuring of the Company.  Notably, GAAP net loss for the fourth quarter of 2014 was improved 18.5% compared to the previous quarter.  In that press filing Defendant Michels said: "We have made remarkable progress since we announced our strategic restructuring last June, and in virtually all aspects, outperformed our stated objectives in the second half of 2014."  Terry Gallagher, vice president and Chief Financial Officer ("CFO") added, "The benefits of our new business model are evident in our improving metrics, including cash efficiency and expanded gross market.

31.     This financial improvement has been a definite trend for the past several financial periods; notably, on May 5, 2015, the Company issued a press release announcing financial results for its first quarter of 2015.  The Company again showed sequential improvement exceeding their restructuring plans, noting GAAP net loss improved by 7.6% from the previous quarter, as well as a 23.3% increase in infrastructure revenues from the previous quarter.  Defendant Michels spoke on the financial success in the press noting, "The resulting financial performance was enabled by our ongoing strategic shift."  Michels also noted a positive future outlook, stating, "...our current outlook for long-term growth remains positive."  CFO Gallagher also noted that Anadigics was implementing cost improvement measures, and that, "These actions are expected to enable a more

streamlined operating structure that lays the foundation for ANADIGICS' long-term improvement."

**B.      The Unfair and Inadequate Process**

32.     The Proposed Transaction is the result of an unsolicited "superior offer" being presented to the Company during the Tender Offer period the Previous Transaction. Pursuant to the terms of the Previous Transaction, Anadigics filed the Previous Recommendation Statement with the SEC on November 24, 2015 regarding the process leading up to the entry into the Previous Transaction, from which the Proposed Transaction stems.

33.     On April 23, 2014, Defendant Michels met with John Ocampo ("Ocampo"), President of GaAs Labs, who indicated that GaAs Labs might be interested in a transaction with the Company.

34.     On June 26, 2014, in an attempt to improve its business operations in a highly competitive market, Anadigics announced a strategic restructuring of its business operations (the "2014 Strategic Restructuring"), the goal of which was to lower operating costs and better align resources to address growth opportunities in rapidly expanding infrastructure markets.

35.     In August 2014, Defendant Michels received unsolicited phone calls from representatives of three separate entities whom expressed interest in a possible strategic transaction with the Company. The entities were labeled as Company A, a competitor company, Company B, a non-competitor that operates in Anadigics' industry, and a private equity fund. At this time, Company A entered into a non-disclosure and standstill agreement (an "NDA") with Anadigics and sent a representative to tour Anadigics' facility. The Previous Recommendation Statement notes that none of the three interested entities elected to move forward with any transaction with the Company.

36.     On September 11, 2015, Defendant Michels received an unsolicited call from Ocampo, noting that GaAs Labs was still interested in a strategic transaction with Anadigics. Subsequently on September 15, 2015, GaAs Labs and the Company entered into a mutual NDA.

37.     During September 2015 Defendant Michels contacted Needham to explore the possible formal engagement of the firm as the Company's financial advisor in the context of a potential strategic transaction. Defendant Michels also spoke with Needham and outside corporate legal counsel, Greenbaum, Rowe, Smith & Davis LLP ("Greenbaum") regarding a potential transaction with GaAs Labs, specifically.

38.     On September 30, 2015 Anadigics received a letter from GaAs Labs outlining a preliminary proposal to acquire the Company via an all-cash tender offer at a price range between $0.38 to $0.42 per share, subject to, among other things, a 60-day exclusivity period, the completion of due diligence, and the finalization of a definitive merger agreement.

39.     The Previous Recommendation Statement indicates that at all points up to, and including, the September 30, 2015 offer by GaAs Labs, all contact between GaAs Labs representatives went solely to Defendant Michels.

40.     On October 5, 2015, the Anadigics Board met to discuss the GaAs Labs proposal, along with Needham and Greenbaum. At this meeting, the Board determined to have Needham "shop" the Company for some period of time to strategic and other potential buyers before entering into a definitive merger agreement with GaAs Labs. However, contrary to this statement, at the very same meeting, the Previous Recommendation Statement notes that the Board determined that GaAs Labs' offer constituted the "only serious expression of interest in the Company." As such, the Board agreed that they should proceed immediately with the exploration of a strategic transaction, including the September 30, 2015 GaAs Labs Proposal. As a result, the Company

failed to identify II-VI as a potential purchaser, thus costing Plaintiff and the class the termination fee of $1.2 million.

41.      Indeed, while the Company claims that from October 12 through October 20, 2015, Needham contacted 17 parties, three of which executed NDAs, including one competitor and two foundries, the fact remains that GaAS had already been identified as the "only serious expression of interest in the Company."

42.      Clearly being aware of this, on November 9, 2015, GaAs Labs indicated it was revising its offer price down to $0.35 per share, and refused attempts to renegotiate the price upwards.

43.      Notably, on November 9, 2015, the Board approved an extension of Defendant Michels employment agreement as CEO of the Company, which was set to expire on December 31, 2015, for a two-year period.

44.      On November 11, 2015, the Board approved a Merger Agreement with GaAs Labs which contained a Go-Shop period (the "Previous Merger Agreement").

45.      On November 12, 2015 the Company announced the Previous Proposed Transaction. The Company also began renewed efforts to shop the Company to other prospective buyers.

46.      In a December 7, 2015 amendment to the Previous Recommendation Statement, the Board indicated that several acquisition proposals had been elicited during the Go-Shop period.

47.      In a December 16, 2015 amendment to the Previous Recommendation Statement, the Board indicated that on December 15, 2015 the Company had received an offer from II-VI to acquire all of the outstanding shares of Anadigics for $0.48 per share in cash in the form of an all-cash tender offer. The amendment noted that the Board considered this a "Superior Offer" under

the terms of the Previous Merger Agreement, thus giving GaAs Labs a five business day period to renegotiate with the Company.  Granting such a lengthy "matching rights" period to GaAs Labs under the Previous Merger Agreement is further evidence of the abject failure of the Individual Defendants to organize and run a proper sales process for the Company.

48.     In a December 23, 2015 amendment to the Previous Recommendation Statement, the Board indicated that on December 21, 2015 GaAs Labs revised their offer from $0.35 per share to $0.48 per share, which included an increase in the termination fee from $1.2 million to $2.5 million. This amendment also noted that on December 22, 2015, II-VI also revised its offer, from $0.48 to $0.54 per share.  The amendment further stated that II-VI's revised offer constituted a "Superior Offer" under the Previous Merger Agreement, thus giving GaAs Labs a two business day period to renegotiate with the Company.

49.     On December 24, 2015, the Previous Recommendation Statement was amended to reflect that an excluded party ("Party B") sought to acquire the Company, and that the Company would review it.

50.     On December 30, 2015, the Previous Recommendation Statement was amended to reflect that GaAs Labs had increased their per share offer price to $0.54 per share on December 28, 2015 and that on December 29, 2015, II-VI amended their price to $0.58 per share. The latter proposal was considered by the Company Board to be a "Superior Offer" under the terms of the Previous Merger Agreement.

51.     In a December 31, 2015, amendment to the Previous Recommendation Statement, the Company Board noted that on December 30, 2015, Party B had submitted an offer to purchase Anadigics at $0.68 per share in cash pursuant to a tender offer.  The amendment noted that there

13

were "certain material issues" in the offer that the Board had to resolve, but was not specific as to these issues.

52.     On January 6, 2016, the Previous Recommendation Statement was amended to reflect that GaAs Labs had increased their per share offer price to $0.58 per share on January 4, 2016, and that on January 5, 2016, II-VI amended their price to $0.62 per share. The amendment also noted that on January 5, 2016, Party B had delivered a proposal which changed several terms of their December 30, 2015, proposal, but did not affect the $0.68 per share purchase price. At this time II-VI's offer was considered by the Company Board to be a "Superior Offer" under the terms of the Previous Merger Agreement.

53.     On January 12, 2016, the Previous Recommendation Statement was amended to reflect that GaAs Labs had increased their per share offer price to $0.62 per share on January 7, 2016, and that on January 11, 2016, II-VI amended their price to $0.66 per share. The amendment also noted that on January 8, 2016, Party B had delivered a proposal which increased its offer to $0.68. At this time II-VI's offer was considered by the Company Board to be a "Superior Offer" under the terms of the Previous Merger Agreement. The Company made no determination at that time regarding Party B offer, even though it was a higher bid than II-VI.

54.     In a January 19, 2016 amendment to the Previous Recommendation Statement, Anadigics announced that, on January 15, 2016, it had terminated the Previous Proposed Transaction and had entered into signed a Merger Agreement pursuant to the terms of II-VI's January 11, 2016, offer for $0.66 per share in cash. Also on January 19, 2016, the Company issued a press release announcing the Proposed Transaction.

55.     Notably, the termination of the Previous Proposed Transaction resulted in the Company paying to GaAs Labs a termination fee of $1.2 million. Clearly the Company was worth

14

far more than the offer price in the Previous Proposed Transaction, and had the Board of Directors initiated a proper sales process for the Company from the start, it is likely that such a fee would have never needed to have been paid. Furthermore, the Individual Defendants failed to negotiate for a lowered termination fee should their termination come as a result of a solicitation sought during the "Go-Shop" period of the Previous Proposed Transaction; a common practice in mergers and acquisitions. By failing to do this they ensured that they not only had to be a termination fee, but that it would be one at a higher price.

56.     On January 25, 2016, in an 8-K filing with the SEC, Anadigics announced it had received an unsolicited offer to purchase the company from Party B. This offer purports to purchase the Company for $0.76 per share in an all-cash tender offer. Should this offer be determined by the Company Board to be a "superior offer" under the terms of the Proposed Transaction, and should it eventually be accepted, it will result in Anadigics paying out $2.4 million over two termination fees. Clearly, the Company was worth far more than it was shopped for in the Previous Proposed Transaction, and the Individual Defendants failure to implement a proper sale process has resulted in the possibility of the Company losing $2.4 million.

## C.     The Proposed Transaction

57.     On January 19, 2015, Anadigics issued the following joint press release announcing the Proposed Transaction:

WARREN, N.J., January 19, 2016 — ANADIGICS, Inc. (Nasdaq: ANAD) ("ANADIGICS" or the "Company") today announced that, on January 15, 2016, it entered into a definitive agreement and plan of merger pursuant to which II-VI Incorporated ("II-VI") has offered to acquire all of the outstanding shares of ANADIGICS common stock on a fully diluted basis for $0.66 per share net in cash, pursuant to an all-cash tender offer and second-step merger (the "II-VI Merger Agreement"). The offer price in the II-VI Merger Agreement constitutes an increase of $0.31 per share over the November 11, 2015 agreement and plan of merger pursuant to which affiliates of GaAs Labs, LLC offered to acquire all of the outstanding shares of ANADIGICS common stock on a fully diluted basis for

$0.35 per share net in cash, pursuant to an all-cash tender offer and second-step merger (the "GaAs Labs Merger Agreement"). On January 12, 2016, the Company announced that the $0.66 per-share offer from II-VI (an "Excluded Party," as defined in the GaAs Labs Merger Agreement, and referred to in the Company's January 12, 2016 announcement as "Party A") had been determined by the Company's Board of Directors to constitute a "Superior Offer," as that term is defined in the GaAs Labs Merger Agreement.

After the Company announced on January 12, 2016 that the $0.66 per-share offer from II-VI (referred to therein as "Party A") had been determined by the Company's Board of Directors to constitute a "Superior Offer," as that term is defined in the GaAs Labs Merger Agreement, GaAs Labs declined to submit to the Company a further amended acquisition proposal.

On January 14, 2016, another Excluded Party ("Party B"), whose proposed merger agreements were referenced in certain of the Company's previous announcements, delivered to the Company a further revised proposed merger agreement pursuant to which it offered, subject to the terms thereof, to acquire all of the outstanding shares of the Company's common stock on a fully diluted basis for $0.75 per-share net in cash pursuant to an all-cash tender offer and second-step merger ("Party B's January 14, 2016 Proposed Amended Merger Agreement"). However, despite the increased per-share offer price, Party B's January 14, 2016 Proposed Amended Merger Agreement, in the business judgment of the Company's Board of Directors, fails to incorporate certain key terms and conditions demanded by the Board of Directors for the protection of the Company and its stockholders. Because Party B is a Chinese company, the closing of Party B's proposed acquisition of the Company would potentially be subject to delay caused by, among other things, the review and clearance process to be undertaken by the Committee on Foreign Investment in the United States ("CFIUS"). Based upon its consultation with the Company's management and its legal advisors, the Company's Board of Directors estimates that it could take 100 days or so from the date of the Company's execution of a merger agreement with Party B for the parties to confer with CFIUS, to assemble and prepare the materials required to make the CFIUS filing, to make the actual CFIUS filing and for CFIUS to complete what could then be a 75-day review period. To protect the Company's business and financial condition in the event the closing of the proposed transaction with Party B were in fact delayed as a result of the time-consuming CFIUS review process, the Company's Board of Directors demanded, among other things, that Party B (a) agree to pay to the Company on the terms proposed by the Company a cash reverse termination fee in the event that the proposed transaction does not close in a timely manner or at all and (b) provide a loan, as needed, to the Company on terms acceptable to the Company and its bank, in the event that the proposed transaction does not close in a timely manner or at all.

In the business judgment of the Company's Board of Directors, in light of the Company's current business and financial condition, including the challenges to the Company's business and financial condition caused by the uncertainty surrounding the bidding process in which the Company has been engaged since

November 2015, Party B's January 14, 2016 Proposed Amended Merger Agreement does not provide the Company and its stockholders with adequate protection against the potentially irreparable harm to the Company's business and financial condition that could result in the event that the proposed transaction with Party B does not close in a timely manner or at all. The Company's Board of Directors considered, among other things, that, if Party B were unable to consummate the proposed merger transaction with the Company in a timely manner or at all as a result of the CFIUS review process or otherwise, the Company could, by that time, have suffered irreparable declines in its financial and business condition and lost the opportunity to obtain $0.66 per-share for the Company's stockholders through the II-VI Merger Agreement, which, if not accepted by the Company, was to expire, by its terms, on January 15, 2016.

The Company's Board of Directors therefore weighed the comparative likelihood of completing the proposed transactions with II-VI and Party B, respectively, in assessing the overall value to the Company's stockholders of said transactions. Based upon its consultation with its financial and legal advisors, as well as upon discussions that its financial advisors and management have had with II-VI, the Company's Board of Directors believes that, subject to the satisfaction of the terms of the proposed II-VI tender offer for the Company's shares, II-VI may be able to close its proposed merger transaction with the Company in approximately 45 to 60 days.

The Company's Board of Directors also considered the fact that the Company's execution of the II-VI Merger Agreement does not preclude Party B (or any other bidder), prior to the closing of the Company's proposed merger with II-VI, from submitting, or the Company's Board of Directors from considering, a further amended offer to acquire the Company.

Accordingly, the Company's Board of Directors, in consultation with its financial and legal advisors, unanimously determined in the good-faith exercise of its business judgment that, because there remain significant regulatory and other risks that render uncertain Party B's ability to close a merger transaction with the Company in a timely manner or at all, and because Party B's January 14, 2016 Proposed Amended Merger Agreement does not adequately protect the Company and its stockholders against the potentially irreparable harm to the Company's financial and business condition that could result from such a delay or failure to close, it would not be in the best interests of the Company and its stockholders for the Company to enter into Party B's January 14, 2016 Proposed Amended Merger Agreement.

Instead, after consulting with its financial and legal advisors concerning the respective amended acquisition proposals that have been delivered to the Company by GaAs Labs, II-VI and Party B since November 2015, the Company's Board of Directors has unanimously determined in the good-faith exercise of its business judgment that the Company's execution of the II-VI Merger Agreement on January 15, 2016, the date on which the offer set forth therein was to expire if

17

not accepted by the Company, is in the best interests of the Company and its stockholders.

In accordance with the terms of the GaAs Labs Merger Agreement, ANADIGICS notified GaAs Labs on January 15, 2016 of the Company's execution of the II-VI Merger Agreement and intention to terminate the GaAs Labs Merger Agreement. Also on January 15, 2016, in accordance with the terms of the II-VI Merger Agreement, the termination fee that was owed by the Company to GaAs Labs under the GaAs Labs Merger Agreement was paid to GaAs Labs by II-VI.

58.     Before announcing the Proposed Transaction on January 19, 2013, Anadigics had

discussions and/or negotiations with its Board, II-VI, Company financial advisor Needham &

Company ("Needham"), and/or other potential bidders, including GaAs Labs and a Chinese

company, Party B, concerning the decision to sell the Company and/or the terms of that sale. Upon

information and belief, the substance of these discussions and negotiations occurred, almost

exclusively, in and around New Jersey.

**D.     The Unfair Price**

59.     The failure of the Individual Defendants to secure an adequate price is apparent

from the $0.66 per share consideration to which the Individual Defendants agreed.

60.     Although the merger price is markedly better than that entered into in the Previous

Proposed Transaction, in reality, the merger consideration fails to fully account for the fact that

Anadigics stock is clearly on the rise.

61.     For example, Anadigics stock has traded as high as $1.55 per share within the past

two years, or a valuation over 134% higher than the amount offered in the Proposed Transaction.

62.     Furthermore, a group of four *Yahoo! Finance* analysts have recently stated that

Anadigics warrant a price as high as $1.25, or a valuation 47.2% greater than that offered in the

Proposed Transaction.

63.     The fact that a bidding war erupted for the Company after the Previous Proposed

Transaction was entered into is indicative of Anadigics' high value and prospects for growth. This

is exemplified in the January 13, 2016 article by *Zacks Equity Research* titled "Offer Price for Anadigics Keep Rising, Shares Rocket".

64.     The same bidding war is also indicative of the complete lack of process controls on the part of the Board in their original negotiations with GaAs Labs, all of which up and until GaAs Labs first offer, went through Defendant Michels alone without any review from the Board whatsoever.

65.     Finally, it is of note that the Company Board refused to entertain the idea that the most lucrative transaction offered, by Party B, was not entertained. The amendments to the Previous Recommendation Statement note that the highest offer was for $0.68 per share, and several articles (including a January 19, 2016 *Pittsburgh Post-Gazette* titled "Saxonburg Company II-Vi to buy two businesses") note that the offer could have increased as high as S.75 per share. Now, based on the January 25, 2016 8-K, it is clear that the Company is now considering Party B's offer. Nevertheless, the Previous Recommendations Statement and current materials released by the Company are woefully inadequate in explaining why such an obviously higher per share offer was dismissed out of hand in favor of the $0.66 offer from II-VI.

66.     Given the Company's recent strong performance and its positioning for continued growth, the Proposed Transaction consideration is inadequate. The Proposed Transaction will deny Plaintiff the right to share proportionately and equitably in the true value of Anadigics valuable and profitable business.

67.     II-VI is seeking to acquire the Company at the most opportune time, when Anadigics is finally poised to profit and grow from the Company's recent decision to restructure.

68. As these indicators make clear, Anadigics, if properly exposed to the market for corporate control, would bring a price materially in excess of the amount offered in the Proposed Transaction.

### E. Insiders Stand to Gain Material Benefits

69. Rather than negotiate a transaction that was in the best interests of Anadigics' common shareholders, the Company's executive officers and directors are acting to better their own personal interests through the Proposed Transaction as evidenced by the Merger Agreement and the Previous Recommendation Statement.

70. Under the terms of the Merger Agreement, upon the consummation of the Proposed Transaction, all stock options and restricted stock awards will be subjected to vesting, instantly converting the holdings of many of the Individual Defendants and other Company insiders into cash. Notably, Defendant Michels stands to gain approximately $120,000 in options and/or restricted stock units.

71. Furthermore, several of the Individual Defendants are the beneficiaries of so-called "Golden Parachutes", granting them lucrative cash rewards should there be a change in control of the Company, such as the one contemplated in the Proposed Transaction. Notably, Defendant Michels stands to gain approximately $1.9 million from his Golden Parachute alone.

72. None of these material benefits available to Company Insiders are available to Anadigics' public shareholders.

### F. The Preclusive Deal Protection Devices

73. The Proposed Transaction is also unfair because, as part of the Merger Agreement, the Individual Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no

competing offers will emerge for the Company.

74.     The Merger Agreement contains a prohibitive termination fee and provides that under specified circumstances the Company must pay a steep $1.2 million termination fee.

75.     The Merger Agreement also contains a strict "no solicitation" provision prohibiting the members of Anadigics' Board from taking any affirmative action to comply with their fiduciary duties to maximize shareholder value, including soliciting alternative acquisition proposals or business combinations.

76.     Pursuant to Section 5.3(c) of the Merger Agreement, should an unsolicited bidder arrive on the scene, the Company must notify II-VI of the bidder's offer within twenty-four hours, including the identity of the bidder, and all relevant details of those inquiries or proposals. Thereafter, should the Board determine that the unsolicited offer is superior; II-VI is granted three business days to amend the terms of the Merger Agreement. II-VI would then be able to match the unsolicited offer because it is granted unfettered access to the unsolicited offer, in its entirety, eliminating leverage that the Company has in receiving the unsolicited offer.

77.     This high termination fee coupled with the No Solicitation Provision will all but ensure that no competing offer will be forthcoming.

78.     In other words, the Merger Agreement gives II-VI access to any rival bidder's information and allows II-VI a free right to top any superior offer. Accordingly, no rival bidder is likely to emerge because the Merger Agreement unfairly assures that any "auction" will favor II-VI and piggy-back upon the due diligence of the second bidder.

79.     Ultimately, these preclusive deal protection provisions improperly restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board

may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

## FIRST CAUSE OF ACTION

### (Against the Individual Defendants for Breach of Fiduciary Duties)

80.     Plaintiff repeats and realleges each allegation set forth herein.

81.     The Individual Defendants have violated fiduciary duties owed to the public shareholders of Anadigics.

82.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants have failed to obtain for Anadigics' public shareholders the highest value available for Anadigics in the marketplace and have failed to fully disclose all material information to Anadigics' public shareholders.

83.     As demonstrated by the allegations above, the Individual Defendants breached their fiduciary duties owed to Anadigics' shareholders because they failed to take steps to maximize the value of Anadigics to its public shareholders in a change of control transaction and failed to provide Anadigics' public shareholders with all information necessary to make a fully informed decision whether to tender their shares in connection with the Proposed Transaction.

84.     As a result of the actions of Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive the highest available value for their equity interest in Anadigics and will not have all necessary and material information needed to make a fully informed decision whether to tender their shares in connection with the Proposed Transaction. Unless the Individual Defendants are enjoined by the Court, they will continue to

22

breach their fiduciary duties owed to Plaintiff and to the Class members, all to the irreparable harm of the Class members.

85.     Plaintiff and the Class members have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from immediate and irreparable injury, which the Individual Defendants' actions threaten to inflict.

## SECOND CAUSE OF ACTION

### (Against Anadigics, II-VI and Merger Sub for Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty)

86.     Plaintiff repeats and realleges each allegation set forth herein.

87.     Anadigics, II-VI and Merger Sub have acted with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to Anadigics' public shareholders, and have participated in such breaches of fiduciary duties.

88.     Anadigics, II-VI and Merger Sub have knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein. In so doing, Anadigics, II-VI and Merger Sub rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Transaction in breach of their fiduciary duties.

89.     Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands relief in his favor and in favor of the Class and against Defendants as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class representative;

B.     Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company

adopts and implements a procedure or process to obtain a merger agreement providing the best available terms for shareholders;

C.     Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.     Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the wrongdoing;

E.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorney's and experts' fees; and

F.     Granting such other and further equitable relief as this Court may deem just and proper.

Dated: January 25, 2016                    BRODSKY & SMITH, LLC

                                           Evan J. Smith
                                           Marc L. Ackerman
                                           1040 Kings Highway N., Suite 601
                                           Cherry Hill, NJ 08034
                                           Tel. (856) 795-7250

                                           *Attorneys for Plaintiff*

BRODSKY & SMITH, LLC
Evan J. Smith
Marc L. Ackerman
1040 Kings Highway N., Suite 601
Cherry Hill, NJ 08034
Tel. (856) 795-7250

*Attorneys for Plaintiff*

| | |
|---|---|
| WES ZALEWSKI, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ANADIGICS, INC., RON MICHELS, DENNIS STRIGL, RICHARD KELSON, DAVID FELLOWS, HARRY REIN, RONALD ROSENZWEIG, II-VI INCORPORATED, and REGULUS ACQUISITION SUB, INC.,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION: SOMERSET COUNTY<br>DOCKET NO. C-12005-16<br><br><br>Civil Action |



FILED
JAN 26 2016
CIVIL DIVISION
SOMERSET COUNTY

## RULE 4:5-1 CERTIFICATION

I certify, to the best of my information and belief, that the matter in this action involving the aforementioned breaches of fiduciary duty is not the subject of any other action pending in any other court of this State. I further certify, to the best of my information and belief, that the matter in controversy in this action is not the subject of a pending arbitration proceeding in this State, nor is any other action or arbitration proceeding contemplated. I certify that there is no other party who should be joined in this action at this time.

Dated: January 27, 2016                          BRODSKY & SMITH, LLC

                                                 Evan J. Smith
                                                 Marc L. Ackerman
                                                 1040 Kings Highway N., Suite 601
                                                 Cherry Hill, NJ 08034
                                                 Tel. (856) 795-7250

                                                 *Attorneys for Plaintiff*


## RULE 1:38-7(c) CERTIFICATION OF COMPLIANCE

I certify that confidential personal identifiers have been redacted from documents now

submitted to the court, and will be redacted from all documents submitted in the futre in

accordance with Rule 1:38-7(b).


Dated: January 27, 2016                          BRODSKY & SMITH, LLC

                                                 Evan J. Smith
                                                 Marc L. Ackerman
                                                 1040 Kings Highway N., Suite 601
                                                 Cherry Hill, NJ 08034
                                                 Tel. (856) 795-7250

                                                 *Attorneys for Plaintiff*

2